UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



12 CIV 7319

| | |
|---|---|
| HOMEWARD RESIDENTIAL, INC., solely in its capacity as Master Servicer for the Option One Mortgage Loan Trust 2006-3, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2006-3 Certificates,<br><br>Plaintiff,<br><br>- against -<br><br>SAND CANYON CORPORATION, f/k/a Option One Mortgage Corporation,<br><br>Defendant. | Index No.<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Homeward Residential, Inc. ("Homeward Residential"), solely in its capacity as Master Servicer for the Option One Mortgage Loan Trust 2006-3 ("the Trust"), brings this lawsuit for the benefit of the Trustee of the Trust and the holders of certificates issued by the Trust, and for its complaint against Sand Canyon Corporation ("Sand Canyon") states as follows:

## Nature of the Action

1.     In 2006, Sand Canyon (then known as Option One Mortgage Corporation) and certain of its subsidiaries sold a pool of more than 5,600 mortgage loans with a total initial principal balance of about $1.1 billion to the Trust. In connection with that sale, Sand Canyon made more than fifty representations and warranties regarding the mortgage loans.

2.     Sand Canyon represented, among other things, that the loans it was selling to the Trust complied with Sand Canyon's stated underwriting guidelines, that the information Sand Canyon had provided about the loans was true and correct, and that there had been no fraud in the origination of the loans. Sand Canyon also made various representations concerning key

loan metrics intended to measure whether it was likely that borrowers would be able to repay their loans.  Sand Canyon agreed that in the event of a material breach of any of its representations, it would cure the breach or repurchase the loan in question.

  3.  This lawsuit concerns 96 loans with respect to which Sand Canyon breached its representations and warranties.  Homeward brings this lawsuit to require Sand Canyon to repurchase these loans or otherwise make the Trust whole.

## The Parties

  4.  Homeward Residential is a Delaware corporation with its principal place of business in Coppell, Texas.  Homeward Residential was formerly called American Home Mortgage Servicing, Inc.  Homeward Residential is the Master Servicer for the Trust.

  5.  Defendant Sand Canyon is a California corporation with its principal place of business in Irvine, California.  Until 2008, Sand Canyon was known as Option One Mortgage Corporation.

## Jurisdiction and Venue

  6.  This dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs, hence the Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332.

  7.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(3).  The parties have also "irrevocably waive[d] any objection" to venue in this Court in the contracts at issue.

## Factual Background

**A.**  **The creation of the Trust**

  8.  In a mortgage-backed securitization, a mortgage originator, or a sponsor, first assembles a pool of mortgage loans.  This pool of loans is then typically transferred by the originator or sponsor to an affiliated entity called the "depositor"; the depositor then transfers the

loans to a specially-created mortgage trust. This trust then issues securities -- usually referred to as "certificates" -- entitling holders to a certain specified share in the income to the trust as borrowers make their mortgage payments. The money received from the sale of the certificates flows back to the originator or sponsor as payment for the loans.

9.      In the present case, Option One/Sand Canyon originated the mortgages, and transferred them to Option One Mortgage Acceptance Corporation as depositor. This transfer was structured as a sale and purchase of the loans, and is documented in a Mortgage Loan Purchase Agreement between Option One (and some special-purpose Option One "seller trusts") and Option One Mortgage Acceptance Corporation, dated as of October 19, 2006. (The Purchase Agreement is Exhibit A to this Complaint.)

10.     Option One Mortgage Acceptance Corporation then conveyed "all right, title and interest" in the mortgage loans to the Trust by means of a Pooling and Servicing Agreement dated as of October 1, 2006. Wells Fargo Bank, N.A., was a party to this Pooling Agreement as Trustee. (The Pooling Agreement is Exhibit B to this Complaint.)

11.     The Trust subsequently issued and sold certificates in various classes (or "tranches"), with each class having a different claim on the income to the Trust. The Trust was structured to provide the certificates with various forms of credit support, including overcollateralization, pool insurance, and an interest rate swap agreement. Credit support was also provided by Sand Canyon's representations and warranties with respect to the quality of the loans in the pool and its obligation to repurchase loans in the event of breach of these representations and warranties.

**B.      Sand Canyon's representations**

12.     Sand Canyon's representations concerning the mortgage loans included the following:

3

- That "[t]he information set forth on each Schedule [of mortgage loans]" -- which identifies the borrower, the mortgaged property's appraised value, and loan-to-value ratios, among other information -- "is true and correct in all material respects." (Purchase Agreement § 3.01(a)(4).)

- That "[t]o the Originator's knowledge, there was no fraud involved in the origination of the Mortgage Loan by the mortgagee or by the Mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan." (Id. § 3.01(a)(24).)

- That the mortgage file "contains an appraisal of the Mortgaged Property indicating the appraised value at the time of origination for such Mortgaged Property.  Each appraisal has been performed in accordance with the provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989." (Id. § 3.01(a)(25).)

- That "[e]ach Mortgage Loan was originated substantially in accordance with the Originator's underwriting criteria, which are at least as stringent as the underwriting criteria set forth in the Prospectus Supplement." (Id. § 3.01(a)(28).)

- That "[e]ach Mortgage Loan was originated in compliance with all applicable local, state and federal laws." (Id. § 3.01(a)(50).)

13.     For certain of the loans -- the so-called "Group I" loans[1] -- Sand Canyon made

additional representations, including the representation in § 3.01(b)(3) that:

> The methodology used in underwriting the extension of credit for each Group I Mortgage Loan employs objective mathematical principles which relate the borrower's income, assets and liabilities to the proposed payment, in accordance with the Originator's Underwriting Guidelines, and does not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension.  Such underwriting methodology confirmed that at the time of origination the borrower had a reasonable ability to make timely payments on the Group I Mortgage Loan.

14.     Sand Canyon's representations were material to the Trust and the

Certificateholders because Sand Canyon represented that the loans met credit quality standards

---

[1]     Of the 5,625 loans listed on the Mortgage Loan Schedule (Exhibit D to the Pooling Agreement), 2,927 were in Group I, and 2,698 were in Group II.  All of the loans sold to the Trust were subject to the representations and warranties in § 3.01(a) of the Purchase Agreement; only those in Group I were also subject to the representations and warranties in § 3.01(b).

that indicated that borrowers would be able to repay their loans.  Breaches of these

representations therefore have a material and adverse effect on the value of the loans and the

interests of the Certificateholders in the loans.

C.      **Sand Canyon's obligation to cure or repurchase**

15.      Any breach by Sand Canyon of its representations that materially and adversely

affects the value of a loan or materially and adversely affects the interests of the Trust and its

Certificateholders in that loan requires Sand Canyon to cure the breach within 120 days of

discovery or notice of the breach.  (Purchase Agreement § 3.04.)  If Sand Canyon cannot cure the

breach, it is obliged to repurchase the loan if required to do so.  (Id.)  The Pooling Agreement

defines the "Purchase Price" at which Sand Canyon must repurchase the loan.

16.      For breaches related to a mortgage loan already sold from the Trust (typically as a

result of foreclosure), Sand Canyon must pay the difference between the Purchase Price as

calculated immediately prior to the liquidation and any liquidation proceeds.

17.      Sand Canyon also agreed to indemnify the Trust and the Certificateholders and

hold them harmless against any "costs, fees, and expenses," including "legal fees and related

costs," in any way related to Sand Canyon's failure to perform its duties under the Purchase

Agreement, arising from a breach of Sand Canyon's representations and warranties, or relating to

the origination of the loans.  (Purchase Agreement § 5.01(e).)

D.      **The Master Servicer is authorized to enforce Sand Canyon's repurchase obligations for the benefit of the Trustee and the Certificateholders.**

18.      In the Purchase Agreement, Sand Canyon "acknowledge[d] and consent[ed] to the

assignment by the Purchaser [Option One Acceptance Corporation] to the Trustee of all of the

Purchaser's rights against each Seller and the Originator pursuant to this Agreement insofar as

such rights relate to Mortgage Loans transferred to the Trustee and to the enforcement or

exercise of any right or remedy against each Seller or the Originator pursuant to this Agreement by the Trustee." (Purchase Agreement § 7.08.)

19.     In the Pooling Agreement, Option One Mortgage Acceptance Corporation transferred to the Trustee "all the right, title and interest" it held in the loans. (Pooling Agreement § 2.01.) And in § 2.03(a), the Pooling Agreement expressly states that the Trustee can seek redress for "breach by the Originator of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement."

20.     The Pooling Agreement gives Homeward Residential, as Master Servicer of the Trust, the authority to enforce Sand Canyon's obligations -- including Sand Canyon's obligation "to purchase a Mortgage Loan . . . on account of missing or defective documentation or on account of a breach of a representation, warranty or covenant" -- "for the benefit of the Trustee and the Certificateholders." (Id. § 3.02(b).) "Such enforcement, including, without limitation, the legal prosecution of claims, . . . shall be in such form and carried out to such an extent and at such time as the Servicer, in its good faith business judgment, would require were it the owner of the related Mortgage Loans." (Id.)

**E.     Sand Canyon's breaches of its representations**

21.     In a letter dated March 8, 2012, the Trustee gave Sand Canyon notice that it had discovered breaches of Sand Canyon's representations and warranties with respect to certain mortgage loans that materially and adversely affected the value of the loans or the Trust's interest in those loans, and demanded that Sand Canyon either cure those breaches or repurchase those loans within 120 days, as required under § 3.04 of the Purchase Agreement and § 2.03 of the Pooling Agreement. The Trustee's letter attached a schedule identifying the loans at issue, described the nature of Sand Canyon's breaches, and included documentary evidence of the breaches. (The Trustee's letter and schedule of loans in question is attached as Exhibit C to this

Complaint.[2])  The 120-day cure period expired on July 6, 2012, and Sand Canyon has not cured these breaches or repurchased any loans.

22.     By way of illustration, many of the breaches described in the March 8, 2012 letter concerned Sand Canyon's disregard of its underwriting guidelines.  Sand Canyon represented that each loan in the Trust was "originated substantially in accordance with the Originator's underwriting criteria, which are at least as stringent as the underwriting criteria set forth in the Prospectus Supplement."  (Purchase Agreement § 3.01(a)(28).)  The Prospectus Supplement states that:

> Each mortgage loan applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. . . . Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan. Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed.  (Prospectus Supplement at 56.)

23.     The summary of Sand Canyon's underwriting guidelines in the Prospectus Supplement describes the applicable underwriting guidelines as follows:

- The Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan.  (Id.)

- Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers.  Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition.  Following each appraisal, the appraiser prepares a report which

---

[2]     The schedule listed 119 loans.  On further study, Homeward Residential has decided not to pursue enforcement of Sand Canyon's repurchase obligation with respect to 23 of those loans, and references to those loans have been redacted from the schedule in Exhibit C, along with all but the last four digits of the loan numbers and any information potentially identifying borrowers.

includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. (Id.)

- The Option One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and require Option One's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal supports the loan balance. (Id.)

- Except with respect to the No Documentation program . . ., the Option One Underwriting Guidelines require verification or evaluation of the income of each applicant and, for purchase transactions, verification of the seasoning or source of funds (in excess of $2,500) required for closing. (Id.)

24.     As these statements make clear, Sand Canyon's underwriting standards were intended to provide reasonable assurance that a borrower will be able to repay a loan. When Sand Canyon deviated from its underwriting standards, the risk of default and the risk of loss to the Trust increased.

25.     The pool of loans Sand Canyon sold to the Trust included loans that were approved despite evidence that the borrower overstated his or her income. A borrower's ability to repay a mortgage depends in very large measure on his or her income. A key measure of a borrower's ability to repay is the borrower's debt-to-income ratio ("DTI"): the borrower's monthly debt obligations as a percentage of his or her monthly income. The higher a borrower's DTI -- i.e., the greater the percentage of monthly income a borrower must devote to his or her debt payments -- the greater the borrower's risk of default on a mortgage. Sand Canyon's underwriting guidelines set maximum DTIs for borrowers to qualify for particular loan products. Failure to verify the accuracy of a borrower's income makes a loan riskier and thus materially less valuable to the Trust and Certificateholders.

26.     Several of the loans in the Trust were approved on the basis of overstated income.

For example:

- For a stated-income loan that closed in July 2006, the borrower said he was a self-employed construction worker with a monthly income of $5,749. The originating underwriter ignored certain red flags in the application, such as the fact that the application showed the borrower's income was from another employer, rather than from his own business. Income tax forms from 2005 and 2006 later submitted by the borrower showed that he was actually employed as a machine operator and earned $3,612 per month for 2006. Using the borrower's verified income, his actual DTI was 87%, which exceeded the program maximum DTI of 55%.

- For a stated-income loan that closed in June 2006, the borrower said he was a real estate agent earning $7,500 per month. The applicable underwriting guidelines required the underwriter to determine if the borrower had a reasonable ability to make timely payments on the loan, but the file contains no evidence the underwriter assessed the reasonableness of the stated income. In fact, the borrower's stated income was more than 150% of the 75th percentile salary of a real estate agent in the borrower's geographic area, which should have alerted the origination underwriter of the risk that the borrower's income was overstated. The borrower's subsequent Chapter 7 filing indicated that his income for 2006 was actually $2,192 per month. Using the borrower's verified income for 2006, his DTI is 135%, which exceeds the guideline maximum allowable DTI of 50%.

27.     Other examples of loans deviating from Sand Canyon's underwriting guidelines include loans that were approved despite a failure to verify the borrower's employment. A borrower's employment is of great importance in deciding whether to make a loan because employment status is a key determinant of whether a borrower is likely to be able to repay the loan. Sand Canyon's underwriting practices thus required verification of the truth of borrowers' statements concerning their employment.

28.     Several of the loans in the Trust were approved on the basis of misstated employment. For example:

- For a stated-income loan that closed in July 2006, Sand Canyon's guidelines required the borrower's employment history to be verified for the two years preceding the loan closing. Verification of employment under the stated-income loan program requires independent third-party evidence of the employer's existence, but the origination file contained no evidence that the originating underwriter obtained such evidence. The file did, however,

contain red flags that should have put the underwriter on notice that the borrower has misrepresented his employment, including a July 2006 credit report listing a different employer than the one the borrower listed on his application. Therefore, the loan should not have been approved under the applicable guidelines.

- For a stated-income loan that closed in November 2006, Sand Canyon's guidelines required the borrower's employment history to be verified for the preceding 12 months. But the loan file contained no evidence that the originating underwriter requested or obtained any verification of employment for the borrower, and the loan should not have been approved under the applicable guidelines.

29.     Additional examples of failures to adhere to Sand Canyon's underwriting guidelines relate to loans that were approved despite evidence that the borrower understated his or her debt obligations. Proper review of a borrower's existing debt obligations is a key component of loan underwriting, for like income, a borrower's existing debt impacts DTI. A borrower's misstatement of his or her debts has a material and adverse effect on the value of a loan to the Trust and Certificateholders by disguising the credit risk of the loan.

30.     Several of the loans in the Trust were improperly approved on the basis of understated debt obligations. For example:

- For a stated-income loan that closed in September 2006, Sand Canyon's guidelines required the borrower to disclose all debt obligations on the mortgage application. A post-closing audit report showed that the borrower had obtained a $30,000 line of credit with a monthly payment of $670 the same month that the loan closed. The origination underwriter should have recognized that there was an undisclosed debt, since the origination credit report shows a July 28, 2006 inquiry by the bank that provided that line of credit, and there was no evidence that the underwriter investigated or sought an explanation for eight other inquiries on the origination credit report.

- For a stated-income loan that closed in July 2006, Sand Canyon's guidelines required the borrower to disclose all debt obligations on the mortgage application. An audit showed that the borrower had obtained a $49,300 mortgage with a monthly payment of $458 more than a month before the subject loan closed. The origination underwriter should have recognized the risk of an undisclosed debt, since the origination credit report showed seven inquiries between April and June 2006, and another document in the file showed a $33,000 decrease in the borrower's checking account balance prior

to the subject loan's closing.  There was no evidence that the underwriter investigated or sought an explanation for those facts, and the loan should not have been approved.

31.     Other examples of Sand Canyon's failure to adhere to its underwriting guidelines relate to loans that were approved even though their loan-to-value ("LTV") or combined loan-to-value ("CLTV") ratios exceeded program guidelines.  LTV ratios reflect the amount of equity the borrower has in the property when he or she takes out a mortgage.  For example, an 80% LTV means that the mortgage is for 80% of the property's value, and the borrower's equity is 20%.  That 20% equity provides the borrower with an important incentive not to default (and potentially lose the equity in the property), and also acts as a cushion against loss to the lender in the event a default occurs.  CLTV ratios also take into account all of the liens on the mortgaged property.  Sand Canyon's underwriting guidelines set out maximum limits on the LTV and CLTV ratios for particular loan products.  But when a loan is based on an inflated appraisal of the value of a property, the equity cushion that specified loan-to-value ratios are intended to provide is removed or reduced.

32.     The appraised values used to calculate these ratios were inflated for some of the properties in the Trust.  For example, a stated-income loan to a borrower purchasing a property for $171,000 that closed in June 2006 was funded using an appraised value of $182,000 to calculate the LTV/CLTV of 80%.  But under Sand Canyon's underwriting guidelines, the purchase price should have been used to calculate the LTV/CLTV ratios.  Further, the purchase price of $171,000 was inflated by $51,300, since that price included a seller-held second mortgage that was forgiven the same date it was executed.  Using the true sales price results in an LTV of 121.64%, and so the loan should not have been approved.

33.     Other loans in the Trust are missing documents that are required for the loan to be approved in accordance with Sand Canyon's underwriting standards.  For example, the

origination file for one full-documentation loan was missing virtually all critical documents, including the initial and final application, income documentation, an original appraisal, a final HUD-1 form, a Truth in Lending statement, and an executed note.  A document missing from a loan file indicates that it was not verified during underwriting or that it was removed from the loan file by the loan officer or an underwriter because it did not support the information provided in the application.  Whatever the reason, a missing document represents a departure from Sand Canyon's underwriting guidelines.

## CAUSES OF ACTION

### First Cause of Action:  Sand Canyon Breached its Representations and Warranties

34.     Plaintiff incorporates all previous allegations as though fully set forth here.

35.     The Purchase Agreement and Pooling Agreement are valid and enforceable contracts, and the Trustee, the Certificateholders, and Homeward Residential have performed all the conditions, covenants, and promises they were required to perform under these agreements.

36.     Sand Canyon breached certain of its representations and warranties with respect to the loans identified in this Complaint and the attached schedule.  These breaches materially and adversely affected the value of these loans or the interest therein of the Certificateholders.

37.     Sand Canyon has been given notice of these breaches of its representations and warranties and has failed to cure these breaches in a timely manner, so is required to repurchase those loans.

38.     Many of these loans were liquidated with losses to the Trust when borrowers were unable to make their mortgage payments.  For these loans, Sand Canyon must pay the difference between the Purchase Price as calculated immediately prior to liquidation and any liquidation proceeds, or otherwise make the Trust whole.

### Second Cause of Action:  Sand Canyon Breached its Duty to Cure or Repurchase

39.     Plaintiff incorporates all previous allegations as though fully set forth here.

40.     In the Purchase Agreement and Pooling Agreement, Sand Canyon agreed that if the substance of any representation or warranty it made regarding the mortgage loans in the Trust was inaccurate and that inaccuracy materially and adversely affected the value of the related loan, or the interest therein of the Certificateholders, then it would cure the breached representation or warranty or repurchase the related loan within 120 days of the discovery of the breach.

41.     Sand Canyon received adequate and timely notice of the breaches of its representations and warranties concerning the loans at issue, and those breaches have had a material adverse effect on the value of those loans and the interests of the Certificateholders therein.

42.     Sand Canyon has failed to cure or repurchase the loans at issue within 120 days, so has breached its contractual obligation to cure or repurchase these loans.

43.     Sand Canyon should be required to repurchase these loans.  If a loan is no longer in the Trust, Sand Canyon must pay the difference between the Purchase Price as calculated immediately prior to liquidation and any liquidation proceeds, or otherwise make the Trust whole.

### Third Cause of Action: Indemnity

44.     Plaintiff incorporates all previous allegations as though fully set forth here.

45.     In the Purchase Agreement, Sand Canyon undertook to hold the Trustee and the Certificateholders "harmless against any and all claims, losses, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses" the Trustee and the Certificateholders may sustain in any way related to Sand Canyon's failure to perform its duties

under the Purchase Agreement, arising from a breach of Sand Canyon's representations and warranties, or relating to the origination of the loans.

46.     The Trustee and the Certificateholders have sustained and will continue to sustain losses, costs, fees and expenses arising from breaches of Sand Canyon's representations and warranties, and relating to the origination of the loans and to Sand Canyon's failure to satisfy its obligation under the Purchase Agreement to cure or repurchase.

47.     Sand Canyon should therefore indemnify the Trustee and the Certificateholders for these losses, costs, fees and expenses.

### Prayer for Relief

WHEREFORE Plaintiff prays for relief as follows:

48.     On the First Cause of Action, with respect to Sand Canyon's breaches of its representations and warranties, specific performance of Sand Canyon's repurchase obligations, and for liquidated loans, payment of the difference between the Purchase Price as calculated immediately prior to liquidation and any liquidation proceeds, or damages as needed to make the Trust whole.

49.     On the Second Cause of Action, with respect to Sand Canyon's breach of its contractual obligation to cure or repurchase loans for which there is a material breach of its representations and warranties within 120 days of notice of such a breach, specific performance of Sand Canyon's repurchase obligations, and for liquidated loans, payment of the difference between the Purchase Price as calculated immediately prior to liquidation and any liquidation proceeds, or damages as needed to make the Trust whole.

50.     On the Third Cause of Action, an award sufficient to indemnify the Trustee and the Certificateholders for all losses, costs, fees and expenses sustained as a consequence of Sand Canyon's misconduct.

51.     Reimbursement of the costs and expenses of maintaining this action, including

reasonable attorney and expert fees.

52.     An award of such other and further relief as may be just and proper.

### JURY TRIAL DEMAND

53.     Plaintiff hereby demands a jury trial on the claims asserted herein pursuant to Fed.

R. Civ. P. 38.


DATED:   New York, New York
         September 28, 2012


                                        HUNTON & WILLIAMS LLP

                                        *Brian V. Otero*

                                        Brian V. Otero
                                        Stephen R. Blacklocks
                                        Michael B. Kruse

                                        200 Park Avenue
                                        New York, NY 10166
                                        botero@hunton.com
                                        sblacklocks@hunton.com
                                        mkruse@hunton.com
                                        (212) 309-1000

                                        Attorneys for Plaintiff Homeward
                                        Residential, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOMEWARD RESIDENTIAL, INC., solely in its capacity as Master Servicer for the Option One Mortgage Loan Trust 2006-3, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2006-3 Certificates,<br><br>                        Plaintiff,<br><br>       - against -<br><br>SAND CANYON CORPORATION, f/k/a Option One Mortgage Corporation,<br><br>                        Defendant. | Index No.<br><br><br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Homeward Residential, Inc. ("Homeward Residential"), solely in its capacity as

Master Servicer for the Option One Mortgage Loan Trust 2006-3 ("the Trust"), brings this

lawsuit for the benefit of the Trustee of the Trust and the holders of certificates issued by the

Trust, and for its complaint against Sand Canyon Corporation ("Sand Canyon") states as follows:

**<u>Nature of the Action</u>**

1.      In 2006, Sand Canyon (then known as Option One Mortgage Corporation) and

certain of its subsidiaries sold a pool of more than 5,600 mortgage loans with a total initial

principal balance of about $1.1 billion to the Trust.  In connection with that sale, Sand Canyon

made more than fifty representations and warranties regarding the mortgage loans.

2.      Sand Canyon represented, among other things, that the loans it was selling to the

Trust complied with Sand Canyon's stated underwriting guidelines, that the information Sand

Canyon had provided about the loans was true and correct, and that there had been no fraud in

the origination of the loans.  Sand Canyon also made various representations concerning key

loan metrics intended to measure whether it was likely that borrowers would be able to repay their loans. Sand Canyon agreed that in the event of a material breach of any of its representations, it would cure the breach or repurchase the loan in question.

  3.  This lawsuit concerns 96 loans with respect to which Sand Canyon breached its representations and warranties. Homeward brings this lawsuit to require Sand Canyon to repurchase these loans or otherwise make the Trust whole.

<strong><u>The Parties</u></strong>

  4.  Homeward Residential is a Delaware corporation with its principal place of business in Coppell, Texas. Homeward Residential was formerly called American Home Mortgage Servicing, Inc. Homeward Residential is the Master Servicer for the Trust.

  5.  Defendant Sand Canyon is a California corporation with its principal place of business in Irvine, California. Until 2008, Sand Canyon was known as Option One Mortgage Corporation.

<strong><u>Jurisdiction and Venue</u></strong>

  6.  This dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs, hence the Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332.

  7.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(3). The parties have also "irrevocably waive[d] any objection" to venue in this Court in the contracts at issue.

<strong><u>Factual Background</u></strong>

**A.**  **The creation of the Trust**

  8.  In a mortgage-backed securitization, a mortgage originator, or a sponsor, first assembles a pool of mortgage loans. This pool of loans is then typically transferred by the originator or sponsor to an affiliated entity called the "depositor"; the depositor then transfers the

2

loans to a specially-created mortgage trust. This trust then issues securities -- usually referred to as "certificates" -- entitling holders to a certain specified share in the income to the trust as borrowers make their mortgage payments. The money received from the sale of the certificates flows back to the originator or sponsor as payment for the loans.

9.      In the present case, Option One/Sand Canyon originated the mortgages, and transferred them to Option One Mortgage Acceptance Corporation as depositor. This transfer was structured as a sale and purchase of the loans, and is documented in a Mortgage Loan Purchase Agreement between Option One (and some special-purpose Option One "seller trusts") and Option One Mortgage Acceptance Corporation, dated as of October 19, 2006. (The Purchase Agreement is Exhibit A to this Complaint.)

10.     Option One Mortgage Acceptance Corporation then conveyed "all right, title and interest" in the mortgage loans to the Trust by means of a Pooling and Servicing Agreement dated as of October 1, 2006. Wells Fargo Bank, N.A., was a party to this Pooling Agreement as Trustee. (The Pooling Agreement is Exhibit B to this Complaint.)

11.     The Trust subsequently issued and sold certificates in various classes (or "tranches"), with each class having a different claim on the income to the Trust. The Trust was structured to provide the certificates with various forms of credit support, including overcollateralization, pool insurance, and an interest rate swap agreement. Credit support was also provided by Sand Canyon's representations and warranties with respect to the quality of the loans in the pool and its obligation to repurchase loans in the event of breach of these representations and warranties.

**B.      Sand Canyon's representations**

12.     Sand Canyon's representations concerning the mortgage loans included the following:

- That "[t]he information set forth on each Schedule [of mortgage loans]" -- which identifies the borrower, the mortgaged property's appraised value, and loan-to-value ratios, among other information -- "is true and correct in all material respects." (Purchase Agreement § 3.01(a)(4).)

- That "[t]o the Originator's knowledge, there was no fraud involved in the origination of the Mortgage Loan by the mortgagee or by the Mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan." (Id. § 3.01(a)(24).)

- That the mortgage file "contains an appraisal of the Mortgaged Property indicating the appraised value at the time of origination for such Mortgaged Property. Each appraisal has been performed in accordance with the provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989." (Id. § 3.01(a)(25).)

- That "[e]ach Mortgage Loan was originated substantially in accordance with the Originator's underwriting criteria, which are at least as stringent as the underwriting criteria set forth in the Prospectus Supplement." (Id. § 3.01(a)(28).)

- That "[e]ach Mortgage Loan was originated in compliance with all applicable local, state and federal laws." (Id. § 3.01(a)(50).)

13.    For certain of the loans -- the so-called "Group I" loans[1] -- Sand Canyon made

additional representations, including the representation in § 3.01(b)(3) that:

> The methodology used in underwriting the extension of credit for each Group I Mortgage Loan employs objective mathematical principles which relate the borrower's income, assets and liabilities to the proposed payment, in accordance with the Originator's Underwriting Guidelines, and does not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting methodology confirmed that at the time of origination the borrower had a reasonable ability to make timely payments on the Group I Mortgage Loan.

14.    Sand Canyon's representations were material to the Trust and the

Certificateholders because Sand Canyon represented that the loans met credit quality standards

---

[1]    Of the 5,625 loans listed on the Mortgage Loan Schedule (Exhibit D to the Pooling Agreement), 2,927 were in Group I, and 2,698 were in Group II. All of the loans sold to the Trust were subject to the representations and warranties in § 3.01(a) of the Purchase Agreement; only those in Group I were also subject to the representations and warranties in § 3.01(b).

that indicated that borrowers would be able to repay their loans. Breaches of these representations therefore have a material and adverse effect on the value of the loans and the interests of the Certificateholders in the loans.

**C.      Sand Canyon's obligation to cure or repurchase**

15.      Any breach by Sand Canyon of its representations that materially and adversely affects the value of a loan or materially and adversely affects the interests of the Trust and its Certificateholders in that loan requires Sand Canyon to cure the breach within 120 days of discovery or notice of the breach. (Purchase Agreement § 3.04.) If Sand Canyon cannot cure the breach, it is obliged to repurchase the loan if required to do so. (Id.) The Pooling Agreement defines the "Purchase Price" at which Sand Canyon must repurchase the loan.

16.      For breaches related to a mortgage loan already sold from the Trust (typically as a result of foreclosure), Sand Canyon must pay the difference between the Purchase Price as calculated immediately prior to the liquidation and any liquidation proceeds.

17.      Sand Canyon also agreed to indemnify the Trust and the Certificateholders and hold them harmless against any "costs, fees, and expenses," including "legal fees and related costs," in any way related to Sand Canyon's failure to perform its duties under the Purchase Agreement, arising from a breach of Sand Canyon's representations and warranties, or relating to the origination of the loans. (Purchase Agreement § 5.01(e).)

**D.      The Master Servicer is authorized to enforce Sand Canyon's repurchase obligations for the benefit of the Trustee and the Certificateholders.**

18.      In the Purchase Agreement, Sand Canyon "acknowledge[d] and consent[ed] to the assignment by the Purchaser [Option One Acceptance Corporation] to the Trustee of all of the Purchaser's rights against each Seller and the Originator pursuant to this Agreement insofar as such rights relate to Mortgage Loans transferred to the Trustee and to the enforcement or

exercise of any right or remedy against each Seller or the Originator pursuant to this Agreement by the Trustee."  (Purchase Agreement § 7.08.)

19.    In the Pooling Agreement, Option One Mortgage Acceptance Corporation transferred to the Trustee "all the right, title and interest" it held in the loans.  (Pooling Agreement § 2.01.)  And in § 2.03(a), the Pooling Agreement expressly states that the Trustee can seek redress for "breach by the Originator of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement."

20.    The Pooling Agreement gives Homeward Residential, as Master Servicer of the Trust, the authority to enforce Sand Canyon's obligations -- including Sand Canyon's obligation "to purchase a Mortgage Loan . . . on account of missing or defective documentation or on account of a breach of a representation, warranty or covenant" -- "for the benefit of the Trustee and the Certificateholders."  (Id. § 3.02(b).)  "Such enforcement, including, without limitation, the legal prosecution of claims, . . . shall be in such form and carried out to such an extent and at such time as the Servicer, in its good faith business judgment, would require were it the owner of the related Mortgage Loans."  (Id.)

**E.    Sand Canyon's breaches of its representations**

21.    In a letter dated March 8, 2012, the Trustee gave Sand Canyon notice that it had discovered breaches of Sand Canyon's representations and warranties with respect to certain mortgage loans that materially and adversely affected the value of the loans or the Trust's interest in those loans, and demanded that Sand Canyon either cure those breaches or repurchase those loans within 120 days, as required under § 3.04 of the Purchase Agreement and § 2.03 of the Pooling Agreement.  The Trustee's letter attached a schedule identifying the loans at issue, described the nature of Sand Canyon's breaches, and included documentary evidence of the breaches.  (The Trustee's letter and schedule of loans in question is attached as Exhibit C to this

Complaint.[2])  The 120-day cure period expired on July 6, 2012, and Sand Canyon has not cured

these breaches or repurchased any loans.

22.     By way of illustration, many of the breaches described in the March 8, 2012 letter

concerned Sand Canyon's disregard of its underwriting guidelines.  Sand Canyon represented

that each loan in the Trust was "originated substantially in accordance with the Originator's

underwriting criteria, which are at least as stringent as the underwriting criteria set forth in the

Prospectus Supplement." (Purchase Agreement § 3.01(a)(28).)  The Prospectus Supplement

states that:

> Each mortgage loan applicant completes an application that includes information
> with respect to the applicant's liabilities, income, credit history, employment
> history and personal information. . . . Option One Underwriting Guidelines
> require a reasonable determination of an applicant's ability to repay the loan.
> Such determination is based on a review of the applicant's source of income,
> calculation of a debt service-to-income ratio based on the amount of income
> from sources indicated on the loan application or similar documentation, a
> review of the applicant's credit history and the type and intended use of the
> property being financed.  (Prospectus Supplement at 56.)

23.     The summary of Sand Canyon's underwriting guidelines in the Prospectus

Supplement describes the applicable underwriting guidelines as follows:

- The Option One Underwriting Guidelines are primarily intended to assess the
  value of the mortgaged property, to evaluate the adequacy of such property as
  collateral for the mortgage loan and to assess the applicant's ability to repay
  the mortgage loan.  (Id.)

- Mortgaged properties that are to secure mortgage loans generally are
  appraised by qualified independent appraisers.  Such appraisers inspect and
  appraise the subject property and verify that such property is in acceptable
  condition.  Following each appraisal, the appraiser prepares a report which

---

[2]     The schedule listed 119 loans.  On further study, Homeward Residential has
decided not to pursue enforcement of Sand Canyon's repurchase obligation with respect to 23 of
those loans, and references to those loans have been redacted from the schedule in Exhibit C,
along with all but the last four digits of the loan numbers and any information potentially
identifying borrowers.

includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. (Id.)

- The Option One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and require Option One's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal supports the loan balance. (Id.)

- Except with respect to the No Documentation program . . ., the Option One Underwriting Guidelines require verification or evaluation of the income of each applicant and, for purchase transactions, verification of the seasoning or source of funds (in excess of $2,500) required for closing. (Id.)

24.     As these statements make clear, Sand Canyon's underwriting standards were intended to provide reasonable assurance that a borrower will be able to repay a loan. When Sand Canyon deviated from its underwriting standards, the risk of default and the risk of loss to the Trust increased.

25.     The pool of loans Sand Canyon sold to the Trust included loans that were approved despite evidence that the borrower overstated his or her income. A borrower's ability to repay a mortgage depends in very large measure on his or her income. A key measure of a borrower's ability to repay is the borrower's debt-to-income ratio ("DTI"): the borrower's monthly debt obligations as a percentage of his or her monthly income. The higher a borrower's DTI -- i.e., the greater the percentage of monthly income a borrower must devote to his or her debt payments -- the greater the borrower's risk of default on a mortgage. Sand Canyon's underwriting guidelines set maximum DTIs for borrowers to qualify for particular loan products. Failure to verify the accuracy of a borrower's income makes a loan riskier and thus materially less valuable to the Trust and Certificateholders.

26.     Several of the loans in the Trust were approved on the basis of overstated income.

For example:

- For a stated-income loan that closed in July 2006, the borrower said he was a self-employed construction worker with a monthly income of $5,749. The originating underwriter ignored certain red flags in the application, such as the fact that the application showed the borrower's income was from another employer, rather than from his own business. Income tax forms from 2005 and 2006 later submitted by the borrower showed that he was actually employed as a machine operator and earned $3,612 per month for 2006. Using the borrower's verified income, his actual DTI was 87%, which exceeded the program maximum DTI of 55%.

- For a stated-income loan that closed in June 2006, the borrower said he was a real estate agent earning $7,500 per month. The applicable underwriting guidelines required the underwriter to determine if the borrower had a reasonable ability to make timely payments on the loan, but the file contains no evidence the underwriter assessed the reasonableness of the stated income. In fact, the borrower's stated income was more than 150% of the 75th percentile salary of a real estate agent in the borrower's geographic area, which should have alerted the origination underwriter of the risk that the borrower's income was overstated. The borrower's subsequent Chapter 7 filing indicated that his income for 2006 was actually $2,192 per month. Using the borrower's verified income for 2006, his DTI is 135%, which exceeds the guideline maximum allowable DTI of 50%.

27.     Other examples of loans deviating from Sand Canyon's underwriting guidelines include loans that were approved despite a failure to verify the borrower's employment. A borrower's employment is of great importance in deciding whether to make a loan because employment status is a key determinant of whether a borrower is likely to be able to repay the loan. Sand Canyon's underwriting practices thus required verification of the truth of borrowers' statements concerning their employment.

28.     Several of the loans in the Trust were approved on the basis of misstated employment. For example:

- For a stated-income loan that closed in July 2006, Sand Canyon's guidelines required the borrower's employment history to be verified for the two years preceding the loan closing. Verification of employment under the stated-income loan program requires independent third-party evidence of the employer's existence, but the origination file contained no evidence that the originating underwriter obtained such evidence. The file did, however,

contain red flags that should have put the underwriter on notice that the borrower has misrepresented his employment, including a July 2006 credit report listing a different employer than the one the borrower listed on his application. Therefore, the loan should not have been approved under the applicable guidelines.

- For a stated-income loan that closed in November 2006, Sand Canyon's guidelines required the borrower's employment history to be verified for the preceding 12 months. But the loan file contained no evidence that the originating underwriter requested or obtained any verification of employment for the borrower, and the loan should not have been approved under the applicable guidelines.

29. Additional examples of failures to adhere to Sand Canyon's underwriting guidelines relate to loans that were approved despite evidence that the borrower understated his or her debt obligations. Proper review of a borrower's existing debt obligations is a key component of loan underwriting, for like income, a borrower's existing debt impacts DTI. A borrower's misstatement of his or her debts has a material and adverse effect on the value of a loan to the Trust and Certificateholders by disguising the credit risk of the loan.

30. Several of the loans in the Trust were improperly approved on the basis of understated debt obligations. For example:

- For a stated-income loan that closed in September 2006, Sand Canyon's guidelines required the borrower to disclose all debt obligations on the mortgage application. A post-closing audit report showed that the borrower had obtained a $30,000 line of credit with a monthly payment of $670 the same month that the loan closed. The origination underwriter should have recognized that there was an undisclosed debt, since the origination credit report shows a July 28, 2006 inquiry by the bank that provided that line of credit, and there was no evidence that the underwriter investigated or sought an explanation for eight other inquiries on the origination credit report.

- For a stated-income loan that closed in July 2006, Sand Canyon's guidelines required the borrower to disclose all debt obligations on the mortgage application. An audit showed that the borrower had obtained a $49,300 mortgage with a monthly payment of $458 more than a month before the subject loan closed. The origination underwriter should have recognized the risk of an undisclosed debt, since the origination credit report showed seven inquiries between April and June 2006, and another document in the file showed a $33,000 decrease in the borrower's checking account balance prior

to the subject loan's closing.  There was no evidence that the underwriter investigated or sought an explanation for those facts, and the loan should not have been approved.

31.     Other examples of Sand Canyon's failure to adhere to its underwriting guidelines relate to loans that were approved even though their loan-to-value ("LTV") or combined loan-to-value ("CLTV") ratios exceeded program guidelines.  LTV ratios reflect the amount of equity the borrower has in the property when he or she takes out a mortgage.  For example, an 80% LTV means that the mortgage is for 80% of the property's value, and the borrower's equity is 20%.  That 20% equity provides the borrower with an important incentive not to default (and potentially lose the equity in the property), and also acts as a cushion against loss to the lender in the event a default occurs.  CLTV ratios also take into account all of the liens on the mortgaged property.  Sand Canyon's underwriting guidelines set out maximum limits on the LTV and CLTV ratios for particular loan products.  But when a loan is based on an inflated appraisal of the value of a property, the equity cushion that specified loan-to-value ratios are intended to provide is removed or reduced.

32.     The appraised values used to calculate these ratios were inflated for some of the properties in the Trust.  For example, a stated-income loan to a borrower purchasing a property for $171,000 that closed in June 2006 was funded using an appraised value of $182,000 to calculate the LTV/CLTV of 80%.  But under Sand Canyon's underwriting guidelines, the purchase price should have been used to calculate the LTV/CLTV ratios.  Further, the purchase price of $171,000 was inflated by $51,300, since that price included a seller-held second mortgage that was forgiven the same date it was executed.  Using the true sales price results in an LTV of 121.64%, and so the loan should not have been approved.

33.     Other loans in the Trust are missing documents that are required for the loan to be approved in accordance with Sand Canyon's underwriting standards.  For example, the

origination file for one full-documentation loan was missing virtually all critical documents, including the initial and final application, income documentation, an original appraisal, a final HUD-1 form, a Truth in Lending statement, and an executed note.  A document missing from a loan file indicates that it was not verified during underwriting or that it was removed from the loan file by the loan officer or an underwriter because it did not support the information provided in the application.  Whatever the reason, a missing document represents a departure from Sand Canyon's underwriting guidelines.

## CAUSES OF ACTION

### First Cause of Action:  Sand Canyon Breached its Representations and Warranties

34.     Plaintiff incorporates all previous allegations as though fully set forth here.

35.     The Purchase Agreement and Pooling Agreement are valid and enforceable contracts, and the Trustee, the Certificateholders, and Homeward Residential have performed all the conditions, covenants, and promises they were required to perform under these agreements.

36.     Sand Canyon breached certain of its representations and warranties with respect to the loans identified in this Complaint and the attached schedule.  These breaches materially and adversely affected the value of these loans or the interest therein of the Certificateholders.

37.     Sand Canyon has been given notice of these breaches of its representations and warranties and has failed to cure these breaches in a timely manner, so is required to repurchase those loans.

38.     Many of these loans were liquidated with losses to the Trust when borrowers were unable to make their mortgage payments.  For these loans, Sand Canyon must pay the difference between the Purchase Price as calculated immediately prior to liquidation and any liquidation proceeds, or otherwise make the Trust whole.

**Second Cause of Action:  Sand Canyon Breached its Duty to Cure or Repurchase**

39.     Plaintiff incorporates all previous allegations as though fully set forth here.

40.     In the Purchase Agreement and Pooling Agreement, Sand Canyon agreed that if the substance of any representation or warranty it made regarding the mortgage loans in the Trust was inaccurate and that inaccuracy materially and adversely affected the value of the related loan, or the interest therein of the Certificateholders, then it would cure the breached representation or warranty or repurchase the related loan within 120 days of the discovery of the breach.

41.     Sand Canyon received adequate and timely notice of the breaches of its representations and warranties concerning the loans at issue, and those breaches have had a material adverse effect on the value of those loans and the interests of the Certificateholders therein.

42.     Sand Canyon has failed to cure or repurchase the loans at issue within 120 days, so has breached its contractual obligation to cure or repurchase these loans.

43.     Sand Canyon should be required to repurchase these loans.  If a loan is no longer in the Trust, Sand Canyon must pay the difference between the Purchase Price as calculated immediately prior to liquidation and any liquidation proceeds, or otherwise make the Trust whole.

**Third Cause of Action: Indemnity**

44.     Plaintiff incorporates all previous allegations as though fully set forth here.

45.     In the Purchase Agreement, Sand Canyon undertook to hold the Trustee and the Certificateholders "harmless against any and all claims, losses, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses" the Trustee and the Certificateholders may sustain in any way related to Sand Canyon's failure to perform its duties

13

under the Purchase Agreement, arising from a breach of Sand Canyon's representations and warranties, or relating to the origination of the loans.

46. The Trustee and the Certificateholders have sustained and will continue to sustain losses, costs, fees and expenses arising from breaches of Sand Canyon's representations and warranties, and relating to the origination of the loans and to Sand Canyon's failure to satisfy its obligation under the Purchase Agreement to cure or repurchase.

47. Sand Canyon should therefore indemnify the Trustee and the Certificateholders for these losses, costs, fees and expenses.

## **Prayer for Relief**

WHEREFORE Plaintiff prays for relief as follows:

48. On the First Cause of Action, with respect to Sand Canyon's breaches of its representations and warranties, specific performance of Sand Canyon's repurchase obligations, and for liquidated loans, payment of the difference between the Purchase Price as calculated immediately prior to liquidation and any liquidation proceeds, or damages as needed to make the Trust whole.

49. On the Second Cause of Action, with respect to Sand Canyon's breach of its contractual obligation to cure or repurchase loans for which there is a material breach of its representations and warranties within 120 days of notice of such a breach, specific performance of Sand Canyon's repurchase obligations, and for liquidated loans, payment of the difference between the Purchase Price as calculated immediately prior to liquidation and any liquidation proceeds, or damages as needed to make the Trust whole.

50. On the Third Cause of Action, an award sufficient to indemnify the Trustee and the Certificateholders for all losses, costs, fees and expenses sustained as a consequence of Sand Canyon's misconduct.

51.     Reimbursement of the costs and expenses of maintaining this action, including reasonable attorney and expert fees.

52.     An award of such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

53.     Plaintiff hereby demands a jury trial on the claims asserted herein pursuant to Fed. R. Civ. P. 38.


DATED:   New York, New York
         September 28, 2012

                                     HUNTON & WILLIAMS LLP

                                     *Brian V. Otero*
                                     _____
                                     Brian V. Otero
                                     Stephen R. Blacklocks
                                     Michael B. Kruse

                                     200 Park Avenue
                                     New York, NY 10166
                                     botero@hunton.com
                                     sblacklocks@hunton.com
                                     mkruse@hunton.com
                                     (212) 309-1000

                                     Attorneys for Plaintiff Homeward
                                     Residential, Inc.